The next matter is Delgado v. Osuna Good morning, Your Honors, and may it please the Court. My name is Lindsay Hedrick, and I represent Dr. Rodrigo Luis Delgado. This appeal arises from the District Court's denial of Dr. Luis's Hague petition to return his two Venezuelan sons back to Venezuela following the wrongful retention by their The District Court's judgment should be reversed for two reasons. First, the District Court erred when it found that Dr. Luis and Ms. Osuna had the requisite shared intent to abandon Venezuela as the children's habitual residence without having a meeting in the minds as to the next country where the children would habitually reside. Second— Didn't he agree to have the children permanently leave Venezuela, whether they were going to go to Spain or stay here or what? That was going to be determined later. Respectfully, Your Honor, I would disagree with that. What the family did discuss, and they had discussed this for many years, since 2007 is what the record reflects, is that they were open to leaving Venezuela, and they considered multiple countries. And this particular trip was just an annual trip that they took to the United States every year, so Dr. Luis could attend a urology conference, and the children could come and extend a family vacation and go to Disney World and SeaWorld. On this particular situation, they booked this trip in September 2013, this annual trip, and then the so-called threats that Ms. Osuna alleges in her brief occurred in March 2014. After those threats, the family did not move their tickets up, they did not flee the country. They kept their tickets on this annual trip, they kept them as they were, and they decided at that point that they would extend the family vacation for the children in Ms. Osuna. And they met with someone to help with political asylum applications. Why doesn't that show they weren't planning to go back to Venezuela? Well, Dr. Luis did agree to Ms. Osuna's request on the first day of their stay in the United States to meet with a document interpreter, is what she was. And at that meeting, Dr. Luis made it abundantly clear that he disagreed with the plan that Ms. Osuna had to apply for asylum. He made that statement there, and he made that statement repeatedly after that. He only just disagreed to his own personal application for asylum, that there was an agreement that the mother and the children would apply for asylum, and if it worked out fine, if it worked out to go to Spain, well, then they would cancel the petition. That was not the agreement, that Dr. Luis did not agree with the family applying for asylum to stay permanently in the United States. And in fact, Ms. Osuna sent an email in February 2015, just several months before this Hague petition was filed, and she said to Dr. Luis and her family and friends, I am doing the petition for asylum in the United States to guarantee I will be able to work in the shortest amount of time, and that Dr. Luis will travel to Spain and look for a job. And once he is able to find a job, I will waive the asylum process for us to travel and meet up in European land. In case you're not able to find a job, we can continue with the asylum process. This asylum process, according to Ms. Osuna's own representations, was just a stopgap measure to buy the family some time, to let some civil unrest settle down in Venezuela, and to discuss and potentially explore some options about leaving Venezuela, as they had done for many, many years, well before the children were even born. Are you questioning that the first step, the abandoning the Venezuela home, occurred? We're arguing that the... Forget the second step about where the new one's going to be, but doesn't everyone agree that both of the parents agreed that they would leave Venezuela? Absolutely not, Your Honor. First, the Beresovsky holding by this Court says that parties cannot abandon the prior habitual residence without having a meeting of the minds as to the next country where the children would habitually reside. And it is undisputed by Ms. Osuna and by the District Court that that hadn't occurred. Further, the record is clear that this family never intended to permanently abandon Venezuela. For example, Your Honors, they did not sell their home. They did not sell Dr. Luis's medical practice. They left behind 90% of their belongings. They bought round-trip tickets, returning to Venezuela. They came to the United States on six-month tourist visas. They didn't bring any winter clothes. They only brought two bags for a... At that time, it was a 12-day trip to the United States that extended into the summer. And the reason that Dr. Luis agreed that the children could stay for the summer is he thought it was in their best interest to spend the summer with their cousins, to learn English. And he recognized, there's no dispute, he concedes that there was some civil unrest in Venezuela. And he wanted for that to settle down and that the family was going to explore the possibility that they might move somewhere else. And the United States was off the table. Dr. Luis is a urologist. He needed to be able to provide for his family as a urologist. That was in the best interest of the family. And it's undisputed that he could not do that in the United States without an additional 12 to 14 years of training. And it's an important fact... That's why he was considering Spain, right? That's correct, Your Honor. What happened to that? Again, this was just an exploration process. And at the time that they were talking about potentially moving, again, as they had done since 2007, it was not for... If he could get a position as a physician in Spain, she would come there and move the children there. That's correct, Your Honor. But the situation in Venezuela calmed down. It got better. And their home is there. The children's toys are there. The family is there. They lived in Maracay. The children lived in Maracay their entire life. That was their home. And so once the situation improved in Venezuela, Dr. Luis said, come on back. And that occurred... In Venezuela, where all the people are starving, the zoo animals are starving, everyone is starving in Venezuela. Well, Your Honor, respectfully, the situation in Venezuela, the lower court did not find that Ms. Osuna met the burden of proof on the grave risk defense and has not brought that up on this appeal, has not raised that issue. And we would suggest that the conditions in Venezuela are not proper for this court to consider at this time because the issue was waived by Ms. Osuna. What's an important fact to consider is that at the time all this was happening, this was an intact family. The marriage was intact. Ms. Osuna testified that she loved her husband and that there was never any plan to permanently separate Dr. Luis from his family and particularly his children. I'd like to turn to the issue of consent. And where the district court erred is the district court failed to consider any of the limitations or conditions that Dr. Luis placed upon his consent for the children to come to the United States. There's no dispute that he consented to them being removed temporarily from Venezuela. He was on the plane with them. He flew to the United States with them. They were going to go to SeaWorld and Disney World. But Dr. Luis never consented. And there is absolutely not a shred of evidence to show that Dr. Luis consented to the children living permanently in the United States and without him. In fact, the record shows otherwise. Dr. Luis insisted upon a power of attorney that would retain his parental rights. And that power of attorney said, and translated into English, this shall not imply or be interpreted as a waiver by me to the custody I have on my children. Now, as a physician, Dr. Luis understood the importance of the children being able to get medical care, and that's why he signed that power of attorney. It did nothing more than provide for the children to be able to get medical care. Just weeks after Dr. Luis returned to Venezuela, he talked to Ms. Asuna and said, come on back. This was in July 2014. He left at the end of May 2014. He said, things have calmed down. Come on back. Come on back to Venezuela. And when it was clear that she would not bring the children back, after repeated requests, he filed for divorce. He stopped depositing dollars into a Bank of America account. I mean, he'd had a Bank of America account for years, since 2008. So that's not a dispositive fact to prove that there was any consent for the children to stay in the United States. This was simply a loving father who wanted to provide and care for his children. And once it was clear that his wife had unilaterally decided that she was going to stay in the United States with the children, by herself, without him, where he could not practice medicine, he stopped depositing money into that account. And instead, he put money into her Venezuelan account. And then, of course, he filed this Hague petition. And going back to the cancelable asylum application, as we talked about, he agreed to her request to meet with this document interpreter the first day that they came to the United States for their trip. And at that time, and ever since then, he has made it clear he did not agree with the application. He did not think it was a good idea for the family. And notably, that application was filed by Mrs. Suna in August 2014, months after he left, months after he told... several months after he told her that he didn't agree to the application. What's the status now? At the time of the trial, Your Honor, the status was pending interview, and I'm not aware of any updates since then. We would suggest that the status of the asylum application has no bearing on this court's decision. She had a six-month tourist visa, right? That's correct. That's all expired. Correct. So my understanding is that she is pending the decision on the asylum. She can stay in the United States. And we would suggest that it creates a dangerous precedent to give that asylum application any weight, because the very purpose of the Hague Convention is to prevent unilateral gamesmanship and forum shopping for parents to take their children to a friendly forum and try to obtain custody, and to give any weight to her asylum application to suggest that it's sort of an insurance policy. It only encourages gamesmanship. It encourages people to go to another country and file an asylum application to try to circumvent the very purpose of the Hague Convention. There is no dispute, and it's even clear in Ms. Asuna's briefing, that this asylum application was just a stopgap measure. It was just to buy them time to let things calm down in Venezuela so they can figure out their next step. Your Honor, I would direct your attention to Baxter v. Baxter, a Third Circuit case that has strikingly similar facts, nearly identical to what we have here, of a married couple, an intact family. There's an agreement that the current living situation in Australia was not suitable for their child, and so the mother brings the child to the United States. On a one-way ticket, she brings her important things and documents with her, and the lower court in that case found that the consent defense applied. But the Third Circuit reversed, and the Third Circuit held the record establishes that the party saw the trip from the first instance as an opportunity to escape from the disagreeable circumstances of Bathurst Island to visit family and to buy time to plan their next move. To visit family and to buy time to plan their next move. That is exactly what happened here. They were going to visit their cousins, aunt and uncle in Frisco, Texas, and they were going to buy time to let the situation in Venezuela calm down for Dr. Luis to see if there potentially could be another place where this family could move to stay together and he could practice medicine. Instead, Ms. Asuna was the one who changed her mind and filed that asylum application and refused to come back to their home where all their things were, where their family was, where the family pet was, refused to come back. And he's never been back, right? He's never been back to the United States to visit the children? He was back for the trial, Your Honor, and throughout this time, he remained a constant presence in the children's life. He regularly FaceTimed them. He was corresponding with them. But he's not physically present in the United States. That's correct, Your Honor. There's no dispute that Dr. Luis remained a loving father throughout this whose intention was always to stay connected to his children. Ms. Asuna does not dispute that, and to provide for his children. And then when it was clear that they would not return to their home in Venezuela, that's when he filed his petition. That doesn't ring true because of the discussion about relocating in Spain, which he never pursued. The reason for that, Your Honor, was because the situation in Venezuela improved. And as they had done for years, for years and years, they talked about relocating to another place. Okay, you saved some rebuttal time. Thank you, Your Honor. Mr. Garner. May it please the Court and counsel, I believe that the nutshell of the facts here, as Your Honors have observed, is the district court found that Dr. Luis and Ms. Asuna intended to move from Venezuela and never to go back. That finding is supported in the record by testimony from Ms. Asuna, and indirectly by testimony from Dr. Luis. The plan was for Ms. Asuna and the children to remain in the United States to seek political asylum. Dr. Luis was to look for a job in Spain. If he got one, Ms. Asuna and the children would join him there. Dr. Luis changed his mind and returned to Venezuela. How do we know that Dr. Luis intended to permanently abandon Venezuela in addition to Ms. Asuna's testimony? Dr. Luis was asked on the record at page 372 that when the family went to meet with an immigration consultant in the United States, he learned for the first time that he would have to undergo 12 to 14 years of additional medical training in order to be allowed to practice in the United States. And the transcript says, why weren't you in agreement with that? Because of the medical study that I had to do, what is 14 years of study. The record thoroughly supports the fact that the parties intended to abandon Venezuela as their residence. The issue in this case, the true issue in this case, is well set forth in the reply brief. And the issue there is stated to be where the district court erred was in deeming Venezuela abandoned as the children's habitual residence without a new country of habitual residence being established. The second part of that statement is not required under the Hague Convention. It is not required that a new habitual residence be established. The Hague Convention, according to this court in Larby, requires only that a respondent removed or retained the child somewhere other than the child's habitual residence. Well, if the parents decide we are going to abandon the prior habitual residence, then there can be no wrongful retention in another country. The statement of law, the idea that there has to be a new habitual residence before you can fully vacate the old one, this comes from a misreading of Larby and the case of Moses v. Movis cited within it. Let me briefly go over those things. In Larby, the parents and the kids lived in Texas. Dad was a military officer. He sued for divorce in Texas. He got deployed. Mom was a permanent resident of the U.K. There were lengthy court proceedings and agreed temporary orders. The parties agreed that the child would stay with Mom in London while the dad was deployed. The final divorce decree eventually gave Dad the right to select a residency. Mom then filed a Hague petition granted by the district court based on the U.K. being the last shared agreed resident. This court said no. The mom consented to the state court decree and there was no wrongful retention in the U.K. because there was no shared attempt between the parties to abandon the U.S. That's the key part. In Larby, this court quoted extensively from a case called Movis out of the Ninth Circuit in 2001. This was a case where Israeli parents agreed that the mom and the children would move to the United States for 15 months. After that, there was a dispute over what their agreement was. The district court did not make a finding on that. Dad filed his petition and won in the district court. But the Ninth Circuit reversed because there was no abandonment. And I think the language of the Ninth Circuit is key because it was quoted extensively and relied on by this court in Larby. What the court said is, when a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time. And here's the key language. The same is true if the child's prior habitual residence has been effectively abandoned by the shared intent of the parents. If the parents agree to abandon the prior habitual residence, then the child can become habitually resident in the location in which it now lives. Another case cited extensively in the briefs is the Berezovsky case out of this court in 2014. This case stands for the proposition that the parents have to have a shared agreement. You can't just one parent has an agreement and the other parent thinks they have an agreement. It has to be a shared agreement. And in that case, there was no shared agreement because the child wasn't even born at the time the parents separated. In this case, as I said, the parties agreed, we have to get out of Venezuela. It's too dangerous for our children to live here. The intent was to abandon Venezuela. Your Honor asked about famine in Venezuela. In fact, at this time, there is a food shortage in Venezuela. That was not true at the time the petition was filed or at the time of the trial. There was violence in Venezuela, but it has been only recently that there has been famine in Venezuela, and that's why that was not brought to the attention of the district court. But the bottom line here is, and this is what the court said in Berezovsky, specifically, the convention is aimed at preventing parents from engaging in international forum shopping and gamesmanship by moving a child to a new country in hopes of obtaining a more favorable custody determination from a different court. Where's the evidence of forum shopping in this case? We have the parents agreeing to abandon Venezuela because it's too dangerous for their children. They move to the United States. Dr. Luis files for divorce in Venezuela. I don't know the status of that filing. Where's the forum shopping? They agreed to come here, and it doesn't make any difference, as these cases illustrate, that they had a permanent final destination in mind. So I respect... I agree with the Berezovsky language about to the effect the petitioner does not point to any case law supporting her novel argument that the parents can form a shared intent necessary to abandon prior habitual residence without at some point making a joint decision for the child in the new country. And that's exactly what happened here, Your Honor. The original intent was, we are going to abandon Venezuela, we're going to go to the United States, we're going to talk to the immigration consultant, we're going to get political asylum there, all of us, including the children, and if we're not able to do that... Well, let me back up. Once they got here, Dr. Luis found out that he couldn't practice medicine in the United States without 12 to 14 years of additional training. And understandably, he said, no, I don't want to do that. So plan B became, okay, we'll go forward with the application for asylum here in the United States for the mom and the children. My question is, was there ever a plan A? Yes, sir. Plan A was to come to the United States and seek... That's half of plan A. Plan A was to abandon Venezuela, come to the United States, and apply for political asylum. Nothing about a habitual home in the United States. At that time, asylum was in mind. As Miss... They were trying to escape the violence in Venezuela and had written that off as a country in which to live. When they came to the United States, their plan was to apply for political asylum with the thought, apparently, of remaining here indefinitely, because otherwise the discussion of whether Dr. Luis could practice medicine here would never even have come up. When they found out he could not, plan B became, okay, Dr. Luis, you're going to go back home to Venezuela, and because you have a joint Spanish-Venezuelan citizenship, you can practice medicine in Spain without further training. Well, Dr. Luis went back to Venezuela, but he changed his mind, and he said so in his testimony. He said, and I'm paraphrasing, it's only right and proper for a person to remain a citizen of or continue to live in the country in which he's brought up. That was his explanation. He changed his mind. So the original intent to the U.S., apply. All of them, apply for political asylum. Plan B, once that became unfeasible for Dr. Luis's employment situation, let's try for Spain and see if that works out. But I thought you were arguing that all that's required is the intent to abandon Venezuela as the habitual residence. Indeed, I am. You don't need intent on what the new habitual residence is going to be. Indeed, I am, Your Honor. I'm simply explaining what the mutual plans were the parties had. But you are exactly correct. So how is your position consistent with that language Judge Weiner quoted, that in that one sentence he quoted does have, can be read to indicate you do need shared intent on the new habitual residence? The convention does not require that. The convention requires only that there be a habitual residence of the children that has not been abandoned. In this one, it was abandoned. Our position is Part 1 is all that's necessary. But if Part 2 is necessary, there was a shared intent. Just because there's an original intent doesn't mean it can't change. And these parents made a change in their plan. And Dr. Luis decided that he did not want to go through with it, and he did not. And he cut off child support and filed for divorce, right? He did. As far as I know, he wasn't under any order for child support, but he paid for $500 a month through the rest of that year, and then he stopped. Well, I didn't mean legal child support. I meant paying money to support your children. Yes, yes, he did. He did. There's no question Dr. Luis has been in touch with the children. Your Honor asked, has he been to the United States to see them? As I understand it, he intended to, but some complications came up. I don't know what they were. It's an unfortunate case. But the fact is they abandoned Venezuela because it's too dangerous, and he changed his mind. The last shared intent was to leave Venezuela, and that's the one principle that the one point that this appeal should rest on. Let me briefly discuss the acquiescence and consent defenses. There can be a consent to a wrongful retention. There can be acquiescence to a wrongful retention. The brief goes through and it talks in detail about the facts showing both those things, and I will not take up the Court's time with going over them. However, I do wish to point out an error in the brief. The brief states that the district court found that there had been acquiescence and consent. That is incorrect. The district court found that there had been consent, but not acquiescence. So I apologize to the Court for that error and ask that you read the brief only in the context of consent. If the Court has no further questions. Thank you, sir. We have your argument. Ms. Hendrick, you have some rebuttal time. First, I'd like to address this issue of plan A versus plan B, whether there was a plan A. And the facts establish that there was no plan A. It's illogical that there was a plan A to permanently abandon Venezuela for everyone to apply for asylum for the following reasons. They didn't sell their home. They didn't sell his medical practice. They left behind 90% of their things. And Ms. Asuna even testified that before they left Venezuela, that she got Dr. Luis's paperwork together so that he could look for a job in Spain. So it's illogical that the intent was for this whole family, including Dr. Luis, to apply for asylum in the United States because once they apply for asylum, they can't go back. Why do you inquire about how long it would take to become certified as a doctor in the U.S. if the plan wasn't to be in the U.S.? I don't think the record's clear that that's why he decided not to come to the U.S. or at that point when they met with the interpreter. I'm not sure that the record's clear that that's a fact. I don't know that he didn't know that before. I thought it was at the medical convention. Sometime in that trip he found that it would take this 14 years. I believe that's what Ms. Asuna alleges. I'm not sure the record's clear that that's when he learned that. But in any event, in light of the facts, it makes no sense that this entire family was abandoning Venezuela permanently and leaving all their things, leaving their whole life behind, without tying up the loose ends like anybody would do if they were unless they wanted to give the local officials the impression it was temporary. Well, Your Honor, there's absolutely no evidence that that was the case. Ms. Asuna didn't suggest that at all. I'd like to go through the timeline a little bit about this asylum application. Indeed, Ms. Asuna asked Dr. Luis to come meet with this interpreter. Let's go through our possibilities, our options here. And he agreed to do that. He made it abundantly clear at that meeting he did not agree with the application. He goes back to Venezuela several weeks later. In July, he tells Ms. Asuna, come on back. The situation's better. She refuses. In September, he tells her again to come on back. She applies for asylum. So at the point she applied for asylum, he had already told her, come on back. The situation's better. Judge Clement, you asked about the plan to potentially apply for a job in Spain, and that was always on the table. Dr. Luis is a Spanish citizen. He wouldn't have to go through the same training and certification required in the United States to practice. But even that plan, there was all sorts of contingencies. What if he didn't get a job in Spain? What would they do then? The whole point of this is there were all sorts of contingencies, and they were trying to figure it out. And again, that asylum application, by Ms. Asuna's own words, was just a stopgap measure. It just bought him time to figure it out. And in that time, the situation in Venezuela calmed down, and Dr. Luis said, come home. That's what happens. The ruling of the district court creates a real troubling precedent for any parent who wants to send their children abroad temporarily, whether that be to visit grandparents, whether that be to seek medical treatment, or to go abroad while a parent is deployed, as in larvae. The Berezowski case makes clear that you can't abandon your prior habitual residence without having a meeting in mind to supplant. That language you read, Judge Wiener, is explicit, is clear, that you can't do that. You can't supplant. You can't abandon without having a meeting in mind to supplant. And that's what's happened here. Ms. Asuna doesn't dispute that. The district court doesn't dispute that. And all we're asking for, Your Honors, is for you to reverse the decision of the district court and send these Venezuelan children back to Venezuela, where they were born and raised, to their Venezuelan parents, for a Venezuelan court to make a determination of custody. Is the divorce final? I don't believe that's true, Your Honor. I'm not sure exactly the state of the divorce. Thank you. This completes our docket of questions.